EAGAN AVENATTI, LLP
Michael J. Avenatti, State Bar No. 206929
mavenatti@eaganavenatti.com
Ahmed Ibrahim, State Bar No. 238739
aibrahim@eaganavenatti.com
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Telephone: 949.706.7000
Facsimile: 949.706.7050

Attorneys for Plaintiff-Relator

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., Ex rel. HRAYR SHAHINIAN, M.D., F.A.C.S.,<br><br>Plaintiff-Relator,<br><br>vs.<br><br>KIMBERLY-CLARK CORPORATION, a Delaware Corporation;<br><br>Defendant. | CASE NO.: 2:14-cv-8313-JAK-JPR<br><br>Assigned to: Hon. John A. Kronstadt<br><br>**FIRST AMENDED QUI TAM COMPLAINT**<br><br>**[FILED WITHOUT SEAL PURSUANT TO COURT ORDER DATED OCTOBER 5, 2016 (Dkt No. 28).]**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff and Relator Hrayr Shahinian, M.D., F.A.C.S. by his undersigned attorneys, on behalf of the United States of America, the District of Columbia, the City of Chicago, and the states of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin, alleges as follows:

## I. BACKGROUND

1. This is an action to recover damages and civil penalties on behalf of the United States of America and various State and local governments arising from false and/or fraudulent statements and omissions, records, and claims made and caused to be made by Defendant Kimberly-Clark Corporation and/or its agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and parallel State law false claims provisions.

2. This *qui tam* case is brought against Kimberly-Clark Corporation for marketing and selling surgical gowns, known as the MICROCOOL* Breathable High Performance Surgical Gowns (the "High Performance Gowns" or "MicroCool Gowns"), represented to provide the highest level of protection from the transfer of bodily fluids, bacteria, and infection between a patient and health care professional when in reality, Kimberly-Clark has known since at least as early as 2013 that these gowns failed industry standard tests conducted in accordance with American Society for Testing and Material ("ASTM") protocol, do not meet relevant standards for gowns represented to satisfy the Level 4 liquid barrier protection standards of the Association for the Advancement of Medical Instruments ("AAMI"), and are unsafe as a result. Indeed, from at least as early as 2013 to the present, Kimberly-Clark has continued to sell these gowns as AAMI Level 4 and misrepresent to various Federal, State and local governments and health care facilities receiving public tax dollars that these gowns are

"impermeable" and are effective when treating patients with serious diseases such as Ebola, despite all the while knowing and failing to disclose that they are unsafe for AAMI Level 4 medical procedures and pose great risk of bodily harm and possibly death to patients and healthcare workers around the globe.

3. This action is brought by Relator Hrayr Shahinian, M.D., F.A.C.S., on behalf of the United States of America, the District of Columbia, the City of Chicago, and the states of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin, to recover compensatory and punitive damages penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and the following state and local false claims acts: the Municipal Code of Chicago §1-22-010 to §1-22-060; the District of Columbia False Claims Act (DC ST § 2-308.03 *et seq.*); the California False Claims Act, (Cal. Gov't Code §§ 12650-12655); the Colorado Medicaid False Claims Act, (Col. Rev. Stat. § 25.5-1-104 *et seq.*); the Connecticut False Claims Act (Conn. Gen. Stat. § 4-274 *et seq.*); the Delaware False Claims and Reporting Act (6 Del. C. § 1201 *et seq.*); the Florida False Claims Act (Fla. Stat. § 68.081 *et seq.*); the Georgia Medicaid False Claims Act (O.C.G.A. § 49-4-169 *et seq.*); the Hawaii False Claims Act (H.R.S § 661-21 and H.R.S. 46-171 *et seq.*); the Illinois Whistleblower and Reward Protection Act (740 I.L.C.S. § 175/1 *et seq.*); the Indiana False Claims Act (Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.*); the Iowa Medicaid False Claims Act (Iowa Code Ann. §685.1 *et seq.*); the Louisiana Medical Assistance Programs Integrity Law (La. R.S. § 46:437.2 *et seq.*); the Massachusetts False Claims Act (M.G.L.A. 12 § 5b *et seq.*); the Michigan Medicaid False Claims Act (M.C.L. § 400.607 *et seq.*); the Minnesota False Claims Act (Minn. Stat. § 15C.01 *et seq.*); the Montana False Claims Act (Mont. Code Ann. § 17-8-401 et seq); the Nevada False Claims Act (N.R.S. § 357.010 *et seq.*); the New Jersey False Claims Act (New Jersey Statutes 2A:32C-1 *et seq.*); the New Mexico Fraud

Against Taxpayers Act (N.M. Stat. Ann. § 44-9-1); the New York False Claims Act (N.Y. C.L.S. St. Fin. § 187 *et seq.*); the North Carolina False Claims Act (N.C. Gen. Stat §§1-605 *et seq.*), the Oklahoma Medicaid False Claims Act (56 Okl. St. § 1005 *et seq*. and 2007 OK. A.L.S. 137); the State False Claims Act of Rhode Island (R.I. Gen. Laws § 91.1-3); the Tennessee Medicaid False Claims Act (T.C.A.§ 71-5-181 *et seq.*); the Texas Medicaid Fraud Prevention Law (Tex. Hum. Res. Code §36.002 *et seq.*); the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.1 *et seq.*); the Washington Medicaid Fraud False Claims Act (Wash. Rev. Code § 7466.005 *et seq.)*; and the Wisconsin False Claims for Medical Assistance Act (Updated 05-06 Wis. Stats. § 20.931 *et seq.*).

4. The aforementioned states, the District of Columbia, and the City of Chicago shall hereinafter be collectively referred to as the “Plaintiff States.” The United States of America and the Plaintiff States shall hereinafter be referred to as the “Government Plaintiffs.”

## II. PARTIES

5. Plaintiff and Relator Hrayr Shahinian, M.D., F.A.C.S. (“Plaintiff,” “Relator,” “Shahinian”) is a medical doctor and experienced surgeon who practices and resides in the County of Los Angeles, State of California, within the Central District. He is a skull base surgeon and founder of the Skull Base Institute (SBI). Since 1994, he has pioneered numerous new endoscopic surgical techniques to treat a variety of skull base disorders and is nationally and internationally recognized as one of the first surgeons in the world to use and pioneer endoscopic skull base surgery. He is Board Certified by the American Board of Surgery and has been licensed to practice in California since 1996. He completed his undergraduate studies at the American University of Beirut in 1981 and earned his M.D. in 1985. He earned both degrees with distinction and has been an active member of the honor medical society, Alpha Omega Alpha. In 1986, Dr. Shahinian was recruited to Vanderbilt University Medical Center,

where he completed an internship and residency in general surgery. In 1991, Dr. Shahinian went to New York University's Institute of Reconstructive Plastic Surgery, the premier craniofacial program in the nation where he completed a two-year fellowship in plastic and reconstructive surgery. Thereafter, in 1993, he completed a fellowship in skull base surgery and neurotology in the Department of Head and Neck Surgery in Zurich, Switzerland under the tutelage of Professor Ugo Fisch, the preeminent skull base surgeon in the world at the time. In 1994, Dr. Shahinian completed a second fellowship, in craniofacial surgery, at New York University. He was certified by the American Board of Surgery in 1992, recertified in 2003 and 2014, and is a Fellow of the American College of Surgeons since 2002. From 1994-1996, Dr. Shahinian served as an Assistant Professor of Surgery and Neurosurgery at the State University of New York at Stonybrook, during which time he was also Co-Director (1994-1995), and then Director (1995-1996) of the University's Skull Base Institute. In 1996, Dr. Shahinian was recruited by Cedars-Sinai Medical Center to establish and head its Division of Skull Base Surgery and to direct its Skull Base Institute. Dr. Shahinian accepted the offer, relocated to California and was instrumental in establishing what has become one of the country's largest practices specializing in minimally-invasive endoscopic skull base and brain tumor surgery: The Skull Base Institute (SBI) in Los Angeles. Neurosurgeons from the United States as well as Barcelona, Marseilles, Brussels, Cairo, Kiev, Rome and Czech republic have travelled to Dr. Shahinian for observation and training in Skull Base Surgery. Patients from around the world and most of the 50 states also routinely travel to Los Angeles to be treated by Dr. Shahinian.

6. Dr. Shahinian has received many awards for his work in skull base surgery and has shared his experience and expertise in numerous journal articles, textbook chapters, and national and international presentations. He is also the author of the textbook, "Endoscopic Skull Base Surgery," which was published by Humana Press in 2009. Dr. Shahinian holds a number of patents and has thrice received the National

Aeronautics and Space Administration (NASA) Innovation Award (in 2008, 2011 and 2012) for his work in the field of advanced medical technology.

7. Defendant Kimberly-Clark Corporation ("Kimberly-Clark" or "KC") is a Delaware corporation with its principal executive offices located in Dallas, Texas. KC describes itself as a global company focusing on leading the world in essentials for a better life through product innovation and building its personal care, consumer tissue, K-C Professional, and health care brands. KC is principally engaged in the manufacturing and marketing of a wide range of products mostly made from natural or synthetic fibers. KC owns several well-recognized consumer brands in the field of personal care and tissues, including, among others, Huggies, Pull-Ups, Kotex, Depend, Kleenex, Scott, Cottonelle, Viva, and other brand names.

8. Among its business segments, KC operated a health care segment, which it described as providing "essentials that help restore patients to better health and improve the quality of patients' lives." In 2013, KC reported net sales of over $1.6 billion from its health care segment alone. This segment is focused on the sale of surgical and infection prevention products for the operating room and other medical supplies, and medical devices focused on pain management, respiratory, and digestive health. KC describes itself as "a global leader in education to prevent healthcare-associated infections." KC's health care products were sold under the "Kimberly-Clark" and "ON-Q" brand names. Its health care products included medical exam gloves, facial masks and respirators, and surgical drapes and gowns. According to its 2013 Annual Report, KC sold its products to, among other entities, "health care establishments and high volume public facilities." On information and belief, during all relevant times, KC's market share of the surgical gown market at issue in this lawsuit exceeded 50%.

9. The true names and capacities of defendants DOES 1 through 100, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants

designated herein as DOE are in some manner responsible for the acts and occurrences set forth herein. Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 100, inclusive, as well as the manner in which each DOE defendant is responsible, when the same have been ascertained.

10. Plaintiff is informed and believes, and upon such basis alleges, that at all times herein mentioned, each of the Defendants herein was an agent, servant, employee, co-conspirator, partner, joint venturer, wholly owned and controlled subsidiary and/or alter ego of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

11. Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13. This Court also has jurisdiction because pursuant to 31 U.S.C. § 3730(e)(4) of the Federal False Claims Act, there has been no statutorily relevant public disclosure of the "allegations or transactions" in Relator Shahinian's Complaint prior to filing. Relator Shahinian, moreover, qualifies as an "original source" of the allegations

in this Complaint, as that term is defined by 31 U.S.C. § 3730(e)(4)(A) and (B), even if a statutorily relevant public disclosure has occurred within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

14. This Court has personal jurisdiction over Defendant pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because Defendant has minimum contacts with the United States.

15. Venue is proper pursuant to 28 U.S.C. § 1391(b) & (c) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and because Defendant is subject to the Court's personal jurisdiction in this judicial district. Venue is also proper pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this judicial district, and the alleged acts proscribed by 31 U.S.C. § 3729 have been committed by Defendant in this judicial district.

16. This Court has supplemental jurisdiction over the State law claims alleged herein pursuant to 28 U.S.C. § 1367(a).

17. There has been no statutorily relevant public disclosure of the "allegations or transactions" in Relator's Complaint prior to its filing.

## IV. GENERAL ALLEGATIONS

18. The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") imposes liability on any person or corporation that knowingly presents or causes to be presented a false or fraudulent claim to the United States government for payment or approval (31 U.S.C. § 3729(a)(1)(A)); any person or corporation that makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim (31 U.S.C. § 3729(a)(1)(B)); and/or, conspires to defraud the Government in connection with a false or fraudulent claim (31 U.S.C. § 3729(a)(1)(C)). Proof of specific intent is not required.

19. The FCA provides that any person who violates any of the aforementioned previsions is liable not just for return of all payments falsely made, but also for civil

penalties of up to $11,000 per false claim, and for three times the amount of the damages sustained by the government. The FCA further provides that any person with information regarding false claims submitted to the United States by a person or corporation may bring an action on behalf of the United States and may obtain a share of the damages and civil penalties recovered by the United States.

20. The Plaintiff States have enacted *qui tam* laws analogous to the Federal FCA that almost precisely mirror its language. The same unlawful conduct of Defendant alleged herein that gives rise to its liability under the FCA likewise gives rise to its liability under the analogous laws of the Plaintiff States. As such, Defendant is subject to civil monetary fines and penalties under both the FCA and the parallel statutes of the Plaintiff States.

21. As noted above, this action is brought against KC for marketing and selling surgical gowns represented to be impermeable and to provide the highest level of protection from the transfer of bodily fluids, bacteria, and infection (i.e. Ebola) between patient and health care professional (i.e., AAMI Level 4 protection) when in reality, Kimberly-Clark has known since at least as early as 2013 that these gowns failed industry tests and do not meet relevant standards.

22. From around 2011 to the present and continuing, KC has promoted, marketed, offered for sale, and sold to health care facilities worldwide, including facilities across the country owned and/or operated by the Government Plaintiffs and facilities receiving funds from the United States and Plaintiff States, the High Performance Gowns. Doctors, hospitals, and clinics make use of the High Performance Gowns in the treatment of patients in connection with various surgical procedures and other sensitive treatments. The Government Plaintiffs have made direct purchases of the High Performance Gowns. In other instances, the cost of all or a significant portion of the High Performance Gowns purchased is subsequently passed on to the United States and the Plaintiff States for payment and reimbursement through various federally-funded healthcare programs, such as the Veterans Health Administration,

MediCare, Medicaid, FEHBP, Tri-Care, CHAMPVA, the Federal Employees Compensation Act Program, the Bureau of Prisons, the Indian Health Service, and the State Legal Immigrant Assistance Grants Program, as well as state-funded healthcare programs such as Medi-Cal.

23. KC claimed to their prospective customers that the High Performance Gowns provide the highest level of liquid barrier protection available. According to KC, the High Performance Gowns are "AAMI Level 4" gowns. Indeed, in a press release introducing the High Performance Gowns, KC stated the gowns met the AAMI Level 4 Standard for liquid barrier protection and represented that the "gown helps prevent blood and other bodily fluids from penetrating through to the clinician's skin during any procedure and is specifically designed for the most demanding and fluid-intensive procedures." KC's Vice President of Global Sales and Marketing, Mr. John Amat, was quoted as saying "[t]he gown delivers surgeons and surgical staff a full spectrum of protection and the assurance of barrier integrity, allowing them to concentrate solely on patient care during long and stressful procedures and not on their risk of exposure." Attached as Exhibit A and incorporated herein by this reference is a true and correct copy of the press release dated May 16, 2011.

24. "AAMI" stands for the Association for the Advancement of Medical Instrumentation. AAMI developed the liquid barrier standard to assist healthcare personnel in the selection and use of surgical gowns, drapes, and other protective apparel. "AAMI Level 4" refers to the AAMI Level 4 Liquid Barrier Standard. AAMI performance levels range from 1 (least protective) to 4 (most protective). AAMI guidelines are a widely accepted system of classification for protective apparel and drapes based on liquid barrier performance. Therefore, by claiming the High Performance Gowns are AAMI Level 4 gowns, KC represents that they provide "the highest barrier protection rating available for gowns." KC further represents that the High Performance Gowns provide "Level 4" liquid barrier protection to "critical zones." "Critical zones," according to KC, include the front area of the gown from

chest to knees and "the sleeves from the cuff to above the elbow." Attached as Exhibit B and incorporated herein by this reference is a true and correct copy of KC's full description of the High Performance Gowns, available on its website as of the original filing date of the Complaint in this action.

25. KC also represents that the High Performance Gowns are impermeable and meet and exceed: (a) ANSI/AAMI PB70; (b) ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing; and (c) the ASTM F1671 standard for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration.

26. ANSI/AAMI PB70 is set forth in a document published by AAMI entitled "Liquid barrier performance and classification of protective apparel and drapes intended for use in healthcare facilities." The document discusses a standard establishing minimum barrier performance requirements, a classification system, and associated labeling requirements for protective apparel, surgical drapes, and drape accessories intended for use in health care facilities.

27. ASTM F1670 and ASTM F1671 refer to standard test methods for the resistance of materials used in protective clothing to penetration by synthetic blood and blood-borne pathogens. The methods are based on a test method for measuring resistance of chemical protective clothing materials to penetration by liquids. They are normally used to evaluate specimens from individual finished items of protective clothing, including gowns and their seamed and other discontinuous regions, and individual samples of materials that are candidates for items of protective clothing.

28. From a regulatory perspective, KC knew at all relevant times that surgical gowns such as the High Performance Gowns at issue, are "class II" devices that fall under the classification of "Surgical apparel" pursuant to 21 C.F.R.§ 878.4040. The regulation describes surgical apparel as follows:

> Surgical apparel are devices that are intended to be worn by operating room personnel during surgical procedures **<u>to</u>**

> **protect both the surgical patient and the operating room personnel from transfer of microorganisms, body fluids, and particulate material**. Examples include surgical caps, hoods, masks, gowns, operating room shoes and shoe covers, and isolation masks and gowns. Surgical suits and dresses, commonly known as scrub suits, are excluded. 21 C.F.R. § 878.4040 (emphasis added).

29. Thus, in its submission to the FDA in connection with the gowns at issue, KC described the intended use of the gowns as follows:

> The Kimberly-Clark* MicroCOOL* Breathable High Performance Surgical Gowns, are sterile, single use surgical apparel intended to be worn by healthcare professionals to **help protect both the patient and the healthcare worker from the transfer of microorganisms, body fluids, and particulate matter**. The MicroCool Breathable High Performance Surgical Gowns meet the Level 4 requirements of the AAMI Liquid Barrier classifications. (emphasis added).

30. With respect to testing of the High Performance Gowns, KC represented to the FDA as follows:

> The Kimberly-Clark* MicroCool* Breathable High Performance Surgical Gown, has been tested in compliance with the requirements of Level 4 liquid barrier performance requirements of ANSI/AAMI PB70:2003 "*Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities.*" The MicroCool* Breathable High Performance Surgical Gown also meets the requirements of ASTM1671:2003 *Standard test method for resistance of materials used in protective clothing to penetration by blood-borne pathogens using Phi-X174 bacteriophage penetration as a test system.* The MicroCool* Breathable High Performance Surgical Gown also meets the requirements of Flame Resistant CPSC 1610 Class 1. The MicroCool* Breathable High Performance Surgical Gown has also been tested in compliance with the biocompatibility requirements of ISO 10993 for surface

> devices with limited contact with breached or compromised surfaces. All results of testing met acceptance criteria.

31. On information and belief, KC's representations concerning the level of protection of the High Performance Gowns are not true, and KC has known they are not true since at least as early as 2013. Despite this knowledge, KC has not corrected its representations, has not stopped selling the High Performance Gowns, has not recalled the High Performance Gowns it has already sold and/or caused to be placed in the distribution channel, has not reported the truth to the FDA, and has not alerted the various Federal, State and local governments and health care facilities receiving public tax dollars, which have purchased these gowns, that the gowns were not and are not as represented. In fact, not only do the High Performance Gowns not *meet* the relevant standards for liquid barrier protection, KC has known since at least early 2013 that its High Performance Gowns have *failed* the relevant tests, do not meet AAMI Level 4 and, thus, are at serious risk of causing physicians, health care workers and patients to be unknowingly exposed to serious bacteria, viruses and illness, including but not limited to Ebola, and further causing such individuals to contract such diseases without warning.

32. In or around early 2013 at the latest, KC became aware of failed test results for the High Performance Gowns. During those tests, ASTM F1671 tests of numerous random samples taken from multiple separate manufacturing lots were conducted. In each of the tests, the High Performance Gowns failed at rates that greatly exceeded failure rates acceptable for satisfying AAMI Level 4 standards, with many of the gowns experiencing catastrophic failures. Among other things, the tests revealed that the gowns allowed liquid and bacterial and viral pathogens to penetrate the gowns, thus placing physicians, health care workers and patients at considerable risk.

33. As a result of these failed test results, KC knew that it could no longer honestly represent the High Performance Gowns as being "impermeable," of meeting AAMI Level 4, of meeting ASTM F1670 and F1671 testing standards, and/or of

satisfying ANSI/AAMI PB70. It also knew that its representation to the FDA that the High Performance Gowns helped "protect both the patient and the healthcare worker from the transfer of microorganisms, body fluids, and particulate matter" was false and that the product did not meet the "class II" standard as provided for by regulation (see 21 C.F.R. § 878.4040). KC also knew it should take immediate action to announce that the High Performance Gowns did not meet appropriate standards; recall the gowns; alert Federal, State and local governments and the FDA; alert physicians, health care workers and patients worldwide; and undertake efforts to immediately cause the gowns to be removed from the shelves and distribution channels of health care facilities and distributors worldwide. In short, KC knew as of early 2013 at the latest and likely well over a year earlier, that the High Performance Gowns are not safe for the intended uses and place both patients *and* health care workers at risk of serious infection and bodily harm.

34. However, instead of taking appropriate and immediate action to protect health care professionals and the public at large, KC did nothing of the sort. Kimberly Clark did not recall the gowns; did not alert Federal, State and local governments and the FDA; did not alert physicians, health care workers and patients worldwide; and did not undertake efforts to immediately cause the gowns to be removed from the shelves and distribution channels of health care facilities and distributors worldwide. Indeed, on information and belief, in an effort to place their own monetary self-interest ahead of the welfare of the general public and health care workers worldwide, KC together with certain of its employees, executives, agents, distributors and others took affirmative steps to conceal and cover-up their knowledge and purposely avoid and/or delay the disclosure of the problems with its gowns.

35. Moreover, despite its knowledge as described above, in recent public statements, KC has nevertheless represented that the High Performance Gowns are *safe to use in connection with patients suspected of contracting the Ebola virus*. KC's website states as follows:

> As concerns around the spread of the Ebola virus continue to grow, the number of inquiries we receive regarding recommendations for PPE [i.e., "Personal Protective Equipment"] and our plans for Pandemic Preparedness are growing in tandem. Therefore, we want to proactively provide you with guidance on preparing for a pandemic **as well as solutions for proper PPE**, as well as other resources to answer questions you have about the Ebola Virus Disease.

36. Below this statement on its website, KC shares a link inviting visitors to download the "Kimberly-Clark Personal Protection Solutions Guide," which advises health care facilities to use the High Performance Gowns in connection with treating patients who may be infected with the Ebola virus. The link to this list of KC products, which includes the High Performance Gowns, is also available on KC's letter to customers entitled the "Kimberly-Clark Pandemic Preparedness Customer Letter" dated August 14, 2014. Attached hereto as Exhibit C and incorporated herein by this reference is a true and correct copy of the "Ebola Preparedness" page available on KC's website as of the date of filing of the original Complaint in this action. Attached hereto as Exhibit D and incorporated herein by this reference is a true and correct copy of the list of KC "Personal Protective Equipment" products, which include the High Performance Gowns, that KC recommends in connection with the treatment of suspected or confirmed Ebola patients.

37. Further, on September 19, 2014, KC issued a document entitled "Kimberly-Clark Ebola Virus Disease (EVD) Precautions Brief." In this document, KC provides a list of recommendations for "Personal Protection" from the Ebola virus, as well as the use of "appropriate personal protective equipment (PPE)." With respect to surgical gowns, KC advises health care workers to use "Level 4" gowns—the represented clearance level for the High Performance Gowns—for working with Ebola patients. Attached hereto as Exhibit E and incorporated herein by this reference is a true and correct copy of this document.

38. In short, despite knowing since at least as early as 2013 that its High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and health care workers, KC has recommended these gowns are safe for use in high-risk medical environments, including when treating Ebola. KC's recklessness and indifference to the prospect that it is responsible for placing patients and health care workers at great and unnecessary risk of infection and bodily harm is nothing short of astonishing and, more to the point, utterly reprehensible.

39. On October 10, 2014, AAMI issued a press release entitled "Surgery Protocol for Ebola Includes AAMI Gown Standard." In the press release, AAMI recommends that surgeons and health care workers wear "AAMI Level 4" surgical gowns and drapes when operating on suspected or confirmed Ebola patients. On October 21, 2014, the American College of Surgeons issued a statement echoing the AAMI guidance by advising that due to the significant risk of exposure to blood or bodily fluids, all operating room personnel should wear "AAMI Level 4" impervious surgical gowns. Again, while the public and the health care community is being led to believe that "AAMI Level 4" gowns manufactured and distributed by KC are safe for Ebola patients or other sensitive operations, and KC's gowns have met critical industry standards and are "impermeable," KC together with certain of its employees, executives, agents, distributors, and others have been silent in disclosing the truth.

## V. CLAIMS FOR RELIEF

### <u>COUNT ONE</u>

### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### Presenting or Causing to Be Presented False Claims

40. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

41. The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) provides that liability will attach to any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

42. By virtue of the above-described acts, among others, KC knowingly presented or caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees, or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

43. Plaintiff alleges on information and belief that between 2011 when the High Performance Gowns were first introduced to the market and the present, KC directly and/or indirectly, including through one or more Doe distributors, has sold the High Performance Gowns to health care facilities across the country owned and/or operated by the Government Plaintiffs and to doctors, hospitals, clinics, and other health care facilities receiving funds from the United States and the Plaintiff States.

44. Plaintiff alleges on information and belief that KC directly and/or indirectly, including through one or more Doe distributors, submitted, or caused to be submitted, electronic and/or paper invoices, or other forms of billing statements, to health care facilities across the country owned and/or operated by the Government Plaintiffs and to hospitals, clinics, and other health care facilities receiving funds from the United States and the Plaintiff States, including but not limited to, through various federal and state-funded healthcare programs such as the Veterans Health Administration, MediCare, Medicaid, TriCare, Medi-Cal, and others, in which KC and/or its distributors demanded payment for the sale of High Performance Gowns. Plaintiff does not have access to these billing records, but they are believed to be in the possession of KC. Plaintiff alleges on information and belief that health care facilities owned and/or operated by the Government Plaintiffs made direct payments to KC and/or its distributors for the purchase of the High Performance Gowns, while the above-mentioned facilities receiving funds from the United States and Plaintiff States in

turn caused to be made to the United States and the Plaintiff States claims for reimbursement for the entirety of their purchase of the High Performance Gowns from KC and/or its distributors, or a portion of their purchase.

45. Plaintiff alleges on information and belief that at least as of early 2013, in submitting, or causing to be submitted, those claims for payment to hospitals, clinics, and other health care facilities receiving funds from the United States and the Plaintiff States, including but not limited to, through various federal and state-funded healthcare programs such as the Veterans Health Administration, MediCare, Medicaid, TriCare, MediCal, and others, or in submitting those claims for payment directly to the United States and the Plaintiff States, KC and/or its distributors represented it was entitled to payment for the full invoiced or billed amount because the High Performance Gowns:

(a) are impermeable and protect both the surgical patient and the operating room personnel from transfer of microorganisms, body fluids, and particulate material;

(b) meet AAMI Level 4 Liquid Barrier Standards;

(c) meet ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing;

(d) meet ASTM F1671 standards for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration;

(e) provide “Level 4” liquid barrier protection to “critical zones,” which include the front area of the gown from chest to knees and “the sleeves from the cuff to above the elbow”;

(f) will not leak bodily fluids or pass bacterial organisms either from the health care worker to the patient, or vice versa, and are safe for use in the treatment of patients with infectious diseases or whose treatment require a sterile environment; and/or

(g) provide the highest level of liquid barrier protection such that the gowns are recommended in the treatment of suspected or confirmed Ebola patients.

46. Indeed, KC charges and charged a significant premium for the High Performance Gowns over surgical gowns that do not have these attributes.

47. KC's claims, however, were false in that the High Performance Gowns failed ASTM F1671 tests at rates that exceeded failure rates acceptable for satisfying AAMI Level 4 standards, and the tests revealed that liquid and bacterial matter penetrated the gowns. Accordingly, the High Performance Gowns:

(a) were not impermeable and did not protect both the surgical patient and the operating room personnel from transfer of microorganisms, body fluids, and particulate material;

(b) did not meet AAMI Level 4 Liquid Barrier Standards;

(c) did not meet ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing;

(d) did not meet ASTM F1671 standards for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration;

(e) did not provide "Level 4" liquid barrier protection to the "critical zone" of "the sleeves from the cuff to above the elbow";

(f) did not prevent the leakage of bodily fluids or the passing of bacterial organisms between health care workers and patients, and were not safe for use in the treatment of patients with infectious diseases or whose treatment require a sterile environment; and/or

(g) did not provide the highest level of liquid barrier protection such that the gowns are recommended in the treatment of suspected or confirmed Ebola patients

48. KC's above-referenced representations, along with the facts that KC failed to disclose, were material in that they had a natural tendency to influence, or were capable of influencing, the payment or receipt of money or property. Further, KC's above-referenced representations, along with the facts that KC failed to disclose, were material because a reasonable person would attach importance to the representations or the facts omitted in determining his or her choice of whether to buy the gowns or pay as much as KC demanded for the gowns, and because KC knew or had reason to know that the purchaser would attach importance to the representations or the facts omitted in determining his or her choice of whether to buy the gowns or pay as much as KC demanded for the gowns. Among other things supporting materiality of KC's representations and of the facts KC failed to disclose, KC touted the High Performance Gowns as being superior to other surgical gowns because they (1) provided the highest level of protection from the transfer of bodily fluids, bacteria, and infection between a patient and health care professional (AAMI Level 4), (2) were effective in protecting health care workers in fluid intensive treatments and from patients with the most serious diseases, (3) were recommended as safe to use on patients suspected of having Ebola and, in fact, were aggressively sold as such during the worldwide Ebola crisis. Defendants knew that the Government Plaintiffs, or healthcare facilities receiving funding from the United States, would attach importance to these representations and they would influence their purchasing decisions, and that if these representations were false, the Government Plaintiffs, or healthcare facilities receiving funding from the United States and the Plaintiffs would choose not to purchase the High Performance Gowns or at the very least would not pay nearly as much as they did for the High Performance Gowns. Further, Defendants knew that if they disclosed that the High Performance Gowns did not, in fact, consistently meet AAMI Level 4 standards, failed industry standard tests measuring fluid barrier protection, did not consistently provide "Level 4" liquid barrier protection to "critical zones" such as the sleeve seams, and were not safe—particularly in high fluid medical treatments and in the treatment of

patients suspected of being infected with the Ebola virus—that the Government Plaintiffs, or healthcare facilities receiving funding from the United States and the Plaintiffs, would attach importance to these disclosures and would be influenced by these disclosures in making their purchasing decisions, and would choose not to purchase the High Performance Gowns or at the very least would not pay nearly as much as they did for the High Performance Gowns.

49. KC and/or its distributors knew of the falsity of its claims at least as of early 2013 when it learned about the failed test results for the High Performance Gowns. Therefore, at an absolute minimum, all claims subsequent to early 2013, if not prior, that KC submitted, or caused to be submitted, directly or indirectly to the United States for payment for the sale of the High Performance Gowns, were false or fraudulent claims for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

50. Despite its knowledge as of at least early 2013 that the above material representations concerning the High Performance Gowns were false, KC and/or its distributors nevertheless concealed the truth from the government, its customers, the health care community, and the general public, chose not to correct its false statements, and chose to remain silent and continue selling its High Performance Gowns without revealing the material facts listed above.

51. In addition, upon discovering the falsity of its claims, KC did not fully comply with its obligations to report this material information to the FDA in violation of 21 U.S.C. § 360i, and 21 C.F.R. §§ 803.1 *et seq.* Specifically, among other things, KC as a "manufacturer or importer" must "report certain device malfunctions," "maintain adverse event files," and help the Agency "protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use." See 21 C.F.R. § 803.1.

52. Plaintiff alleges on information and belief that Plaintiff United States and the Plaintiff States, unaware of the falsity of the claims that KC caused hospitals,

clinics, and other health care facilities to make to the United States and the Plaintiff States, and in reliance on the accuracy thereof, reimbursed said hospitals, clinics, and other health care providers for the entirety of their purchase of the High Performance Gowns from KC and/or its distributors, or a portion of their purchase. Plaintiff alleges on information and belief that in many instances, the United States and the Plaintiff States directly paid KC and/or its distributors for the purchase of the High Performance Gowns from KC.

53. For those claims that KC submitted or caused to be submitted directly or indirectly, it was foreseeable and in fact the intended result that those claims would be submitted. Further, at all times relevant to the Complaint, KC and/or its distributors acted with the requisite scienter.

54. By reason of KC and/or its distributors' unlawful practices, as set forth above, substantial numbers of doctors, hospitals, clinics, and other health care facilities in the United States have been induced to purchase substantial quantities of the High Performance Gowns and thus provided substantial profits to KC.

55. It is believed that as a result of the violations of 31 U.S.C. § 3729(a)(1)(A) as described herein, the United States has suffered substantial losses in an amount that exceeds $100 million, the exact amount to be determined at trial, and is further entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by KC.

**COUNT TWO**

**Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

**Creation or Use of False Statements or Records Material to a False Claim**

56. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein

57. The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) provides that liability will attach to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

58. By virtue of the above-described acts, among others, KC knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, and likely continues to do so, in violation of 31 U.S.C. § 3729(a)(1)(B).

59. Plaintiff alleges on information and belief that between 2011 when the High Performance Gowns were first introduced to the market and the present, KC has sold the High Performance Gowns to health care facilities across the country owned and/or operated by the Government Plaintiffs, and to doctors, hospitals, clinics, and other health care facilities receiving funds from the United States and the Plaintiff States, including but not limited to, through various federal and state-funded healthcare programs such as the Veterans Health Administration, MediCare, Medicaid, TriCare, MediCal, and others,

60. Plaintiff alleges on information and belief that in order to induce health care facilities across the country owned and/or operated by the Government Plaintiffs, along with doctors, hospitals, clinics, and other health care facilities receiving funds from the United States and the Plaintiff States to purchase the High Performance Gowns, KC made use of records or statements in the form of brochures, advertising, web pages, spec sheets, catalogs, packaging material, invoices, billing statements, and marketing and promotional materials, in which KC represented that the High Performance Gowns:

(a) are impermeable and protect both the patient and medical personnel from transfer of microorganisms, body fluids, and particulate material;

(b) meet AAMI Level 4 Liquid Barrier Standards;

(c) meet ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing;

(d) meet ASTM F1671 standards for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration;

(e) provide "Level 4" liquid barrier protection to "critical zones," which include the front area of the gown from chest to knees and "the sleeves from the cuff to above the elbow";

(f) will not leak bodily fluids or pass bacterial organisms either from the health care worker to the patient, or vice versa, and are safe for use in the treatment of patients with infectious diseases or whose treatment require a sterile environment; and/or

(g) provide the highest level of liquid barrier protection such that the gowns are recommended in the treatment of suspected or confirmed Ebola patients

61. These records and statements, however, were false in that the High Performance Gowns failed ASTM F1671 tests at rates that exceeded failure rates acceptable for satisfying AAMI Level 4 standards, and the tests revealed that liquid and bacterial matter penetrated the gowns. Accordingly, the High Performance Gowns were not and did not:

(a) impermeable and protect both the surgical patient and the operating room personnel from transfer of microorganisms, body fluids, and particulate material;

(b) meet AAMI Level 4 Liquid Barrier Standards;

(c) meet ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing;

(d) meet ASTM F1671 standards for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration;

(e) provide "Level 4" liquid barrier protection to the "critical zone" of "the sleeves from the cuff to above the elbow";

(f) prevent the leakage of bodily fluids or the passing of bacterial organisms between health care workers and patients, and was not safe for use in the treatment of patients with infectious diseases or whose treatment require a sterile environment; and/or

(g) provide the highest level of liquid barrier protection such that the gowns are recommended in the treatment of suspected or confirmed Ebola patients

62. KC's above-referenced representations, along with the facts that KC failed to disclose, were material in that they had a natural tendency to influence, or were capable of influencing, the payment or receipt of money or property. Further, KC's above-referenced representations, along with the facts that KC failed to disclose, were material because a reasonable person would attach importance to the representations or the facts omitted in determining his or her choice of whether to buy the gowns or pay as much as KC demanded for the gowns, and because KC knew or had reason to know that the purchaser would attach importance to the representations or the facts omitted in determining his or her choice of whether to buy the gowns or pay as much as KC demanded for the gowns. Among other things supporting materiality of KC's representations and of the facts KC failed to disclose, KC touted the High Performance Gowns as being superior to other surgical gowns because they (1) provided the highest level of protection from the transfer of bodily fluids, bacteria, and infection between a patient and health care professional (AAMI Level 4), (2) were effective in protecting health care workers in fluid intensive treatments and from patients with the most serious diseases, (3) were recommended as safe to use on patients suspected of having

Ebola and, in fact, were aggressively sold as such during the worldwide Ebola crisis. Defendants knew that the Government Plaintiffs, or healthcare facilities receiving funding from the United States, would attach importance to these representations and they would influence their purchasing decisions, and that if these representations were false, the Government Plaintiffs, or healthcare facilities receiving funding from the United States and the Plaintiffs would choose not to purchase the High Performance Gowns or at the very least would not pay nearly as much as they did for the High Performance Gowns. Further, Defendants knew that if they disclosed that the High Performance Gowns did not, in fact, consistently meet AAMI Level 4 standards, failed industry standard tests measuring fluid barrier protection, did not consistently provide "Level 4" liquid barrier protection to "critical zones" such as the sleeve seams, and were not safe—particularly in high fluid medical treatments and in the treatment of patients suspected of being infected with the Ebola virus—that the Government Plaintiffs, or healthcare facilities receiving funding from the United States and the Plaintiffs, would attach importance to these disclosures and would be influenced by these disclosures in making their purchasing decisions, and would choose not to purchase the High Performance Gowns or at the very least would not pay nearly as much as they did for the High Performance Gowns.

63. Plaintiff alleges on information and belief that KC submitted, or caused to be submitted, directly and/or indirectly electronic and/or paper invoices, or other forms of billing statements, to health care facilities across the country owned and/or operated by the Government Plaintiffs, and to hospitals, clinics, and other health care facilities receiving funds from the United States and the Plaintiff States, including but not limited to, through various federal and state-funded healthcare programs such as the Veterans Health Administration, MediCare, Medicaid, TriCare, MediCal, and others, in which KC and/or its distributors demanded payment for the sale of High Performance Gowns. Plaintiff does not have access to these billing records, but they are believed to be in the possession of KC and/or its distributors. Plaintiff alleges on information and belief that

said hospitals, clinics, and other health care facilities in turn caused to be made to the United States and the Plaintiff States claims for reimbursement for the entirety of their purchase of the High Performance Gowns from KC and/or its distributors, or a portion of their purchase.

64. KC and/or its distributors knew of the falsity of its claims at least as of early 2013 when it learned about the failed test results for the High Performance Gowns. Therefore, at an absolute minimum, all claims subsequent to early 2013, if not prior, that KC submitted, or caused to be submitted, directly or indirectly to the United States for payment for the sale of the High Performance Gowns, were false or fraudulent claims for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

65. Despite its knowledge as of at least Spring 2013 that the above material representations concerning the High Performance Gowns were false, KC and/or its distributors nevertheless concealed the truth from the government, its customers, the health care community, and the general public, chose not to correct its false records and statements, and chose to remain silent and continue selling its High Performance Gowns without revealing the material facts listed above.

66. Plaintiff alleges on information and belief that Plaintiff United States and the Plaintiff States, unaware of the falsity of the records and/or statements which KC caused hospitals, clinics, and other health care facilities to make to the United States and the Plaintiff States, and in reliance on the accuracy thereof, reimbursed said hospitals, clinics, and other health care providers for the entirety of their purchase of the High Performance Gowns from KC and/or its distributors, or a portion of their purchase. Plaintiff alleges on information and belief that in many instances, the United States and the Plaintiff States directly paid KC and/or its distributors for the purchase of the High Performance Gowns from KC.

67. For those records and/or statements that KC submitted or caused to be submitted, it was foreseeable and in fact the intended result that those records and/or

statements would result in the payment of false reimbursement claims for the High Performance Gowns. Further, at all times relevant to the Complaint, KC and/or its distributors acted with the requisite scienter.

68. By reason of KC and its distributors' unlawful practices, as set forth above, substantial numbers of doctors, hospitals, clinics, and other health care facilities in the United States have been induced to purchase substantial quantities of the High Performance Gowns and thus provided substantial profits to KC.

69. It is believed that as a result of the violations of 31 U.S.C. § 3729(a)(1)(B) described herein, the United States has suffered substantial losses in an amount that exceeds $100 million, the exact amount to be determined at trial, and is further entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be presented by KC.

## COUNT THREE

### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

### Conspiracy

70. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

71. The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C) provides that liability will attach to any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

72. In violation of 31 U.S.C. § 3729(a)(1)(C), by the foregoing acts and omissions, KC and/or its distributors conspired with each other, and likely others, to defraud the United States by knowingly presenting false or fraudulent claims for payment or approval, and by knowingly making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim.

73. By the foregoing acts and omissions, KC and/or its distributors took actions in furtherance of their conspiracies, including but not limited to, on information and belief, entering into agreements and/or reaching understandings amongst themselves to suppress and conceal information suggesting that the High Performance Gowns are not impermeable, are not AAMI Level 4 gowns, failed relevant industry tests and standards, and do not otherwise satisfy the claims made as to the level of liquid barrier protection for the gowns. Said actions constitute violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C). KC and/or its distributors committed other overt acts set forth above in furtherance of that conspiracy, all in violation of the law of, and causing damage to, the United States.

74. As a consequence of KC and its distributors' violations of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered substantial losses in an amount that exceeds $100 million, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim KC and/or its distributors conspired to present for payment or approval.

## COUNT FOUR

### Violation of the California False Claims Act, Cal. Gov. Code § 12651(a)(1)-(2), (8)

75. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

76. This is a claim for treble damages and penalties under the California False Claims Act.

77. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the government of the State of California for payment or approval.

78. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used false records and statements, and omitted

material facts, to induce the government of the State of California to approve and pay such false and fraudulent claims.

79. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud California by inducing the California Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

80. At the very minimum, by virtue of the acts described above, KC and/or its distributors are liable under section 12651(a)(8) of the California Government Code, which provides that a person is liable if he, she, or it "[i]s a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim."

81. The government of the State of California, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' fraudulent statements, fraudulent omissions, and/or business practices.

82. By reason of KC and/or its distributors' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

83. The State of California is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by KC.

## COUNT FIVE

**Violation of the Connecticut False Claims Act, Conn. Gen. Stat. § 4-274, *et seq.***

84. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

85. This is a claim for treble damages and penalties under the Connecticut False Claims Act.

86. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut Government for payment or approval.

87. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Connecticut Government to approve and pay such false and fraudulent claims.

88. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Connecticut by inducing the Connecticut Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

89. The Connecticut Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

90. By reason of KC and/or its distributors' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

91. The State of Connecticut is entitled to penalties and damages set forth in subdivision (b) of section 4-275 of the Connecticut General Statutes for each and every

false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT SIX

## Violation of the Delaware False Claims and Reporting Act, 6 Del. C. § 1201(a)(1)-(3)

92. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

93. This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

94. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Delaware Government for payment or approval.

95. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Delaware Government to approve and pay such false and fraudulent claims.

96. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Delaware by inducing the Delaware Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

97. The Delaware Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

98. By reason of KC and/or its distributors' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

99. The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT SEVEN

### Violation of the Florida False Claims Act, Fla. Stat. Ann. § 68.082(2)

100. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

101. This is a claim for treble damages and penalties under the Florida False Claims Act.

102. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Florida Government for payment or approval.

103. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Florida Government to approve and pay such false and fraudulent claims.

104. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Florida by inducing the Florida Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

105. The Florida Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC

and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

106. By reason of KC and/or its distributors' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

107. The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT EIGHT

### Violation of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)

108. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

109. This is a claim for treble damages and penalties under the Hawaii False Claims Act.

110. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii Government for payment or approval.

111. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Hawaii Government to approve and pay such false and fraudulent claims.

112. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Hawaii by inducing the Hawaii Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

113. The Hawaii Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

114. By reason of KC and/or its distributors' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

115. The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT NINE

### Violation of the Illinois Whistleblower Reward and Protection Act
### 740 Ill. Comp. Stat. § 175/3(a)(1)-(3)

116. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

117. This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

118. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Illinois Government for payment or approval.

119. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Illinois Government to approve and pay such false and fraudulent claims.

120. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Illinois by inducing the Illinois Government to pay or approve false or fraudulent claims, and by knowingly making,

using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

121. The Illinois Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

122. By reason of KC and/or its distributors' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

123. The State of Illinois is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TEN

### Violation of the Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 § 5B(1)-(3)

124. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

125. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

126. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts Government for payment or approval.

127. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Massachusetts Government to approve and pay such false and fraudulent claims.

128. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Massachusetts by inducing the Massachusetts Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

129. The Massachusetts Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

130. By reason of KC and/or its distributors' acts, the State of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

131. The State of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT ELEVEN

### Violation of the Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(a)-(c)

132. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

133. This is a claim for treble damages and penalties under the Nevada False Claims Act.

134. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Nevada Government for payment or approval.

135. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted

material facts, to induce the Nevada Government to approve and pay such false and fraudulent claims.

136. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Nevada by inducing the Nevada Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

137. The Nevada Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

138. By reason of KC and/or its distributors' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

139. The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWELVE

**Violation of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*, and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et. seq.***

140. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

141. This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, and the New Mexico Fraud Against Taxpayers Act.

142. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico Government for payment or approval.

143. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the New Mexico Government to approve and pay such false and fraudulent claims.

144. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud New Mexico by inducing the New Mexico Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

145. The New Mexico Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

146. By reason of KC and/or its distributors' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

147. The State of New Mexico is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT THIRTEEN

**Violation of the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.***

148. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

149. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

150. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina Government for payment or approval.

151. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the North Carolina Government to approve and pay such false and fraudulent claims.

152. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud North Carolina by inducing the North Carolina Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

153. The North Carolina Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

154. By reason of KC and/or its distributors' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

155. The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

**COUNT FOURTEEN**

**Violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)**

156. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

157. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

158. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee Government for payment or approval.

159. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Tennessee Government to approve and pay such false and fraudulent claims.

160. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Tennessee by inducing the Tennessee Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

161. The Tennessee Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

162. By reason of KC and/or its distributors' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

163. The State of Tennessee is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT FIFTEEN

### Violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.002

164. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

165. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

166. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Texas Government for payment or approval.

167. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Texas Government to approve and pay such false and fraudulent claims.

168. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Texas by inducing the Texas Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

169. The Texas Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

170. By reason of KC and/or its distributors' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

171. The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT SIXTEEN

**Violation of the Virginia Fraud Against Taxpayers Act**

**Va. Code Ann. § 8.01-216.3(a)(1)-(3)**

172. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

173. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

174. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Virginia Government for payment or approval.

175. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Virginia Government to approve and pay such false and fraudulent claims.

176. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Virginia by inducing the Virginia Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

177. The Virginia Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented

by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

178. By reason of KC and/or its distributors' acts, the State of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

179. The State of Virginia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT SEVENTEEN

**Violation of the District of Columbia False Claims Act**

**D.C. Code Ann. § 2-308.14(a)(1)-(3), (7)**

180. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

181. This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

182. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

183. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

184. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud the District of Columbia by inducing the District of Columbia Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

185. The District of Columbia Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

186. By reason of KC and/or its distributors' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

187. The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT EIGHTEEN

**Violation of the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq.***

188. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

189. This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

190. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Georgia Government for payment or approval.

191. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Georgia Government to approve and pay such false and fraudulent claims.

192. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Georgia by inducing the Georgia Government to pay or approve false or fraudulent claims, and by knowingly making,

using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

193. The Georgia Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

194. By reason of KC and/or its distributors' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

195. The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT NINETEEN

### Violation of the Indiana False Claims and Whistleblower Protection Act

### Ind. Code Ann. § 5-11-5.5-1 *et seq.*

196. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

197. This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

198. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Indiana Government for payment or approval.

199. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Indiana Government to approve and pay such false and fraudulent claims.

200. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Indiana by inducing the Indiana Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

201. The Indiana Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

202. By reason of KC and/or its distributors' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

203. The State of Indiana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## <u>COUNT TWENTY</u>

### Violation of the Louisiana Medical Assistance Programs Integrity Law

### La. Rev. Stat. Ann. § 437 *et seq.*

204. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

205. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

206. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana Government for payment or approval.

207. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted

material facts, to induce the Louisiana Government to approve and pay such false and fraudulent claims.

208. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Louisiana by inducing the Louisiana Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

209. The Louisiana Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

210. By reason of KC and/or its distributors' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

211. The State of Louisiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-ONE

**Violation of the Michigan Medicaid False Claims Act**

**Mich. Comp. Laws Ann. § 400.601-400.613**

212. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

213. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

214. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Michigan Government for payment or approval.

215. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Michigan Government to approve and pay such false and fraudulent claims.

216. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Michigan by inducing the Michigan Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

217. The Michigan Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

218. By reason of KC and/or its distributors' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

219. The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-TWO

### Violation of the New York False Claims Act, N.Y. State Fin. §§ 187 *et seq.*

220. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

221. This is a claim for treble damages and penalties under the New York False Claims Act.

222. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

223. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

224. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud the State of New York by inducing the New York State Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

225. The New York State Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

226. By reason of KC and/or its distributors' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

227. The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-THREE

### Violation of the Oklahoma Medicaid False Claims Act, 2007 OK, ALS 137

228. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

229. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

230. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma Government for payment or approval.

231. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Oklahoma Government to approve and pay such false and fraudulent claims.

232. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Oklahoma by inducing the Oklahoma Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

233. The Oklahoma Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

234. By reason of KC and/or its distributors' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

235. The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-FOUR

**Violation of the New Jersey False Claims Act, N.J. Stat. Ann. § 2A: 32C-1 *et seq.***

236. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

237. This is a claim for treble damages and penalties under the New Jersey False Claims Act.

238. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey Government for payment or approval.

239. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the New Jersey Government to approve and pay such false and fraudulent claims.

240. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud New Jersey by inducing the New Jersey Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

241. The New Jersey Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

242. By reason of KC and/or its distributors' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

243. The State of New Jersey is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-FIVE

**Violation of the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.***

244. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

245. This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

246. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island Government for payment or approval.

247. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Rhode Island Government to approve and pay such false and fraudulent claims.

248. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Rhode Island by inducing the Rhode Island Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

249. The Rhode Island Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

250. By reason of KC and/or its distributors' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

251. The State of Rhode Island is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-SIX

### Violation of the Wisconsin False Claims for Medical Assistance Act

### Wis. Stat. § 20.931 *et seq.*

252. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

253. This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

254. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin Government for payment or approval.

255. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Wisconsin Government to approve and pay such false and fraudulent claims.

256. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Wisconsin by inducing the Wisconsin Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

257. The Wisconsin Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

258. By reason of KC and/or its distributors' acts, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

259. The State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-SEVEN

### Violation of the City of Chicago False Claims Act

### Municipal Code of Chicago § 1-22-010 to § 1-22-060

260. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

261. This is a claim for treble damages and penalties under the City of Chicago False Claims Act.

262. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the City of Chicago Government for payment or approval.

263. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the City of Chicago Government to approve and pay such false and fraudulent claims.

264. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud the City of Chicago by inducing the City of Chicago Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

265. The City of Chicago Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented

by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

266. By reason of KC and/or its distributors' acts, the City of Chicago has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

267. The City of Chicago is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## <u>COUNT TWENTY-EIGHT</u>

### Violation of the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

268. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

269. This is a claim for treble damages and penalties under the Montana False Claims Act.

270. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Montana Government for payment or approval.

271. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Montana Government to approve and pay such false and fraudulent claims.

272. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Montana by inducing the Montana Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

273. The Montana Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

274. By reason of KC and/or its distributors' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

275. The State of Montana is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT TWENTY-NINE

### Violation of the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-1-104 *et seq.*

276. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

277. This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

278. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Colorado Government for payment or approval.

279. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Colorado Government to approve and pay such false and fraudulent claims.

280. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Colorado by inducing the Colorado Government to pay or approve false or fraudulent claims, and by knowingly making,

using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

281. The Colorado Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

282. By reason of KC and/or its distributors' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

283. The State of Colorado is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT THIRTY

**Violation of the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.***

284. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

285. This is a claim for treble damages and penalties under the Minnesota False Claims Act.

286. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota Government for payment or approval.

287. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Minnesota Government to approve and pay such false and fraudulent claims.

288. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Minnesota by inducing the Minnesota

Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

289. The Minnesota Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

290. By reason of KC and/or its distributors' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

291. The State of Minnesota is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT THIRTY-ONE

**Violation of the Iowa Medicaid False Claims Act, Iowa Code Ann. § 685.1 *et seq.***

292. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

293. This is a claim for treble damages and penalties under the Iowa Medicaid False Claims Act.

294. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Iowa Government for payment or approval.

295. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Iowa Government to approve and pay such false and fraudulent claims.

296. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud Iowa by inducing the Iowa Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

297. The Iowa Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

298. By reason of KC and/or its distributors' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

299. The State of Iowa is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## COUNT THIRTY-TWO

**Violation of the Washington Medicaid Fraud False Claims Act**

**Wash. Rev. Code Ann. § 7466.005 *et seq.***

300. Plaintiff realleges and incorporates by reference each and every allegation above as if the same were fully set forth herein.

301. This is a claim for treble damages and penalties under the Washington Medicaid Fraud False Claims Act False Claims Act.

302. By virtue of the acts described above, KC and/or its distributors knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

303. By virtue of the acts described above, KC and/or its distributors knowingly made, used, or caused to be made or used, false records and statements, and omitted

material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

304. By virtue of the acts described above, KC and/or its distributors conspired with each other, and likely others, to defraud the State of Washington by inducing the Washington State Government to pay or approve false or fraudulent claims, and by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

305. The Washington State Government, unaware of the falsity of the records, statements, and claims made, used, presented or caused to be made, used, or presented by KC and/or its distributors, paid and continues to pay the claims that would not be paid but for KC and/or its distributors' illegal inducements and/or business practices.

306. By reason of KC and/or its distributors' acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

307. The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

## VI. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Shahinian hereby demands a trial by jury.

## VII. PRAYER FOR RELIEF

1. WHEREFORE, Plaintiffs pray for judgment that Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*, and the equivalent provisions of the state statutes set forth above;

2. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the United States has

sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Cal. Gov. Code § 12651(a);

4. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Connecticut False Claims Act;

5. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Delaware False Claims and Reporting Act;

6. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Florida False Claims Act;

7. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Hawaii False Claims Act;

8. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Illinois Whistleblower Reward and Protection Act;

9. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Massachusetts

has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Massachusetts False Claims Law;

10. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Nevada False Claims Act;

11. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the New Mexico Medicaid False Claims Act;

12. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the North Carolina False Claims Act;

13. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Tennessee Medicaid False Claims Act;

14. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Texas Medicaid Fraud Prevention Law;

15. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Virginia Fraud Against Taxpayers Act;

16. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the District of Columbia has

sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the District of Columbia False Claims Act;

17. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Georgia False Medicaid Claims Act;

18. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus the maximum civil penalty allowable under the law for each violation of the Indiana False Claims and Whistleblower Protection Act;

19. The State of Indiana is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented or caused to be made, used, or presented by KC and/or its distributors.

20. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Louisiana Medical Assistance Programs Integrity Law;

21. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Michigan Medicaid False Claims Act;

22. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of the New York False Claims Act;

23. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has

sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Oklahoma Medicaid False Claims Act;

24. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the New Jersey False Claims Act;

25. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Rhode Island False Claims Act;

26. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Wisconsin False Claims for Medical Assistance Act;

27. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the City of Chicago has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the City of Chicago False Claims Act;

28. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Montana False Claims Act;

29. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Colorado Medicaid False Claims Act;

30. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Minnesota has

sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Minnesota False Claims Act;

31. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the Iowa Medicaid False Claims Act;

32. That this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Washington Medicaid Fraud False Claims Act;

33. That Relator Shahinian be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the federal False Claims Act, and the equivalent provisions of the state statutes and the statutes of the City of Chicago and District of Columbia set forth above.

34. That Plaintiffs, including Relator Shahinian, be awarded all costs of this action, including attorneys' fees and expenses;

35. That Plaintiff and Relator Shahinian be awarded a share of any and all proceeds recovered by the Government Plaintiffs as a direct or indirect result of the filing of this Complaint, in an amount to be determined by the Court; and

36. That Plaintiffs recover all such other relief as the Court deems just and proper, or that is necessary to make Plaintiffs whole.

Dated: February 6, 2017

EAGAN AVENATTI, LLP

By: /s/ Michael J. Avenatti
Michael J. Avenatti
Attorneys for Plaintiff-Relator
Hrayr Shahinian, M.D., F.A.C.S.